This is Direct TV v. Mission Broadcasting, et al. And so, let's see, we're going to begin with Mr. Mazzini. Is that right? That's right, Your Honor. And you have reserved two minutes for rebuttal, so that gives you eight to start, two on reserve. And then after that, we'll hear from Mr. Delaney for three minutes. Correct? Yes. All right. Great. Okay. You may proceed. Thank you, Your Honor. May it please the Court. In dismissing Direct TV's complaint in this case, the District Court adopted a novel bright-line rule that no other court has adopted. It held that the only way a consumer can allege antitrust standing in a price-fixing case is if the consumer agreed to pay the inflated prices the conspirators demanded. That's wrong. As every court to address this issue has held, a priced-out non-purchaser can have antitrust standing if they can point to an established course of dealing with the defendants. That's exactly this case. The defendants colluded to fix the prices that they demanded from Direct TV to renew its existing contracts, retransmission consent agreements, with Mission and White Knight. Direct TV refused to pay those inflated price demands, and as a result, it lost subscribers and profits. Direct TV's injury flows from the anti-competitive aspect of the conspiracy, specifically the defendant's ability to set prices above a competitive level, which the Supreme Court has recognized leads not only to the injury of actual payment of inflated prices, but also to reduced demand and reduced output. So that's an antitrust injury, but you just referred to your client as a priced-out non-purchaser. So do you agree that if we were talking about the efficient enforcer factors and we're talking about what a direct injury is, is the injury of a priced-out non-purchaser less direct than somebody who pays the super-competitive prices? I don't think that's right, Your Honor. I think both injuries are equally direct. There's no intervening step. Direct TV was injured at the first step. Its injury isn't derivative of anyone else's injury. When the conspiracy presents a demand for super-competitive prices, the consumer has two choices. It can either pay the prices that are demanded and suffer the injury of the overcharge, or it can refuse to pay and suffer the injury of losing access to the product, which is what happened to direct TV. The overcharge seems like you might think about it as more direct because they're paying super-competitive prices as opposed to having to reduce their output and eventually losing customers. So I guess a couple of responses, Your Honor. So first let me just take issue with the premise. I don't think the fact that direct TV's injury is lost subscribers makes its injury any less direct. I think what this court has held is that when a plaintiff is directly exposed to anti-competitive conduct, the fact that it suffers its resulting injuries in a downstream market doesn't make the injury any less direct. And you can see that, for example— It's a straightforward direct result that they're going to have to reduce output, and it's just natural that you're going to lose customers. So we don't think of that as a separate step. That's right, Your Honor. What about the speculative character of it? Is it more speculative? So if somebody, if a party pays the super-competitive prices, it's pretty clear how much more they're paying above a competitive price, whereas to calculate the effect on a loss of customers might be more speculative. What about that factor? I don't think so, Your Honor. Let me address both the fact of injury and the amount of injury. So as to the fact of injury, I think this is not remotely speculative. It's well understood in this industry that if, as an MVPD like direct TV, if you lose the ability to retransmit a Big Four network, you're going to lose subscribers. That is, it's been recognized by the Department of Justice, and it's the whole basis for the party's negotiations, right? The reason why defendants are able to demand substantial fees to retransmit this content, even under competitive conditions, is because it's understood that if you lose the ability to carry Fox or NBC, you're going to lose subscribers. So it's kind of remarkable for them to claim that link is speculative when it's the whole basis for their business. Then as to the amount, this Court, of course, has said a number of times that potential difficulty in calculating damages is not a get-out-of-court-free card. There's always some uncertainty of damages in an antitrust case. But I think as compared to the mine run of antitrust cases, this is going to be a relatively easy lost sales, lost profits calculation. But wait, can I ask a little more about that? So in your view, there's no difference between a purchaser who paid the anti-competitive price and a person who walks away. They're equally efficient enforcers in your view? I think at least whereas here the non-purchaser can point to an established course of dealing with the defendants, I do think they are equally efficient. But I also think even if you thought that there would be an advantage for someone who paid, here the district court's assumption that there are other MVPs who paid super-competitive prices has absolutely no basis in the record. The complaint alleges that this conspiracy was targeted at DirecTV. But wait, I want to make sure. So you're suggesting there would be then still an antitrust violation even if nobody paid the super-competitive price. So this would be such a wise horizontal price fixing that they would have priced themselves out of any market so that nobody bought. And that seems irrational to me. Your Honor, it would be one thing if you said, okay, they tried to charge super-competitive prices, it didn't work, and so they backed down and accepted competitive prices. But here the blackouts are continuing to this day. So they, and as the complaint explains. As to your client that hasn't purchased, right? That's right. But there are some who did pay, presumably. We don't know that, Your Honor. It's important to understand that. But could you imagine that they didn't? I mean, this is an economic model that has them pricing their products so high that no one buys it. And that's something that we have to intervene with the antitrust laws on. Two points, Your Honor. First, these are bespoke negotiations. They're customer-specific. This isn't one list price for the entire market. So the allegation is that DirecTV was targeted to try to extract super-competitive prices from DirecTV. We don't know whether the defendants in their separate negotiations with other MVPDs, whether they made similar super-competitive demands, whether they colluded. And if they did, we don't know whether any other MVPD agreed to pay those prices. I have a question about that, whether there's more direct victims and so on. So there are some allegations in the complaint that say that this is about price-fixing with respect to DirecTV alone, in which case it's a conspiracy that's about negotiations with DirecTV, in which case there wouldn't be other victims. But there is an allegation in the complaint that says DirecTV is not the only multi-channel, whatever it is, MVPD. That has been victimized by this conduct. So which is it? So, Your Honor, to our knowledge, we are the only victim of this conspiracy. There is one paragraph in the complaint that says Dish has also had blackouts with these same defendants, and so it's possible that Dish was similarly targeted. We don't know that. That's an inference. It's speculative because we don't have access to those negotiations. They're private. And in any event— And if it turned out on summary judgment there were a whole bunch of other victims that are more direct, then that might become an issue then, right? I think that's possible, Your Honor. Antitrust standing can be revisited at the summary judgment stage on a full factual record. But here I think given the allegations of this conspiracy targeted at a single customer trying to renew its existing agreements, this falls— Right, and that's the other point about trying to renew its existing agreements. So you had said before a priced-out non-purchaser, but your allegation is not simply that you're a priced-out non-purchaser but that you have been an ongoing purchaser that then had the cost of an input altered as part of a price-fixing conspiracy. That makes a difference? It does according to the Ninth and Tenth Circuits, Your Honor. What those courts have said is the special concern that's presented by a non-purchaser plaintiff is that anyone in the world could come in and say, well, if this product— So in this case, if DirecTV had a history of not offering these channels and that it wanted to purchase the rebroadcast rights for the first time, and you came in here and you said, well, they charge us too much and we couldn't offer NBC for the first time in our history of offering a TV package, and that's an antitrust injury, that would be different, right? Because it would be kind of speculative as to what the effect on you would have been of offering that channel for the first time. I think it would be different and it might be a harder case for us to show that we would have been a purchaser in a competitive market. I actually still think under the unique conditions of this market, we'd have a pretty decent argument because this is a somewhat unique market where there is a small number of potential purchasers. There's not that many MVPDs. And under federal law, defendants have to negotiate in good faith with any MVPD that wants to acquire retransmission consent rights. So it's not a situation like in Montreal trading where anyone off the street would come in and say, I would have bought Potash if it had been offered at a competitive price. And this is also a non-rivalrous good. So you're not asking would DirecTV have bought it or would somebody else have bought it. It's just the mandatory negotiations with DirecTV, would they have concluded at a competitive price level. If I can reserve the rest of my time for rebuttal if there are no more questions. Can I ask you just a quick question about the injunctive relief you're seeking? Sure, Your Honor. You're saying you're still being blacked out now. Are there negotiations taking place now? I mean, is the injunctive relief going to accomplish anything? Your Honor, my understanding, and this is obviously not in the record, but is that parties' postures are essentially the same as they were a number of years ago. There's been no progress. And, of course, the allegations in the complaint make clear that this collusion in price fixing wasn't a one-off. It's baked into the way the relationship between Nexstar and its sidecars is structured. So Nexstar has basically sidelined the purported management of the sidecars. It's given itself the right to capture all of the sidecars' revenue, all of their equity value, with the result that the sidecars have no skin in the game and they basically function as appendages of Nexstar. I guess, I mean, past purchases are generally considered entitled to damages, but not injunctive relief. And so it seems to me you're asking for both here, and I'm trying to figure out why that is. Well, that's right, Your Honor. What is the injunctive relief that you're seeking? The injunctive relief would be to put a stop to the collusion between Nexstar and its sidecars and require the sidecars to function truly independently and to negotiate on an independent, competitive basis as they're required to under federal law. To eliminate coordination between the sidecars and Nexstar? And Nexstar, that's right. So it's just an order that says don't communicate? Your Honor, I think the specific terms of the injunction would have to be worked out based on a full factual record. But, yes, I think at this point it would be something like you have to independently, negotiations have to be conducted independently by the or at the direction of the sidecars management without any coordination with Nexstar. Well, thank you, Mr. Mazzino. We'll now hear from Mr. Delaney. Thank you, Your Honors. May it please the Court, Andrew Delaney for Amicus United States. We're here to address the district court's erroneous holding that the payment of super competitive prices is the only anti-competitive effect facing consumers from price fixing conspiracy. This is wrong as a matter of law, and as FLEs indicate at page 30 of their brief, they do not dispute this legal principle. The district court erred here because the anti-competitive effects Well, I guess why do we need you to tell us this? Why are they not sort of up to this on their own? I mean, is it a private situation? Yes, Your Honor. We think that this case has potential ramifications beyond just the immediate impact of this case, and so we wanted to weigh in to make sure that the district court's error here was corrected. So why would it have ramifications beyond these private antitrust suits? Your Honor, we think it has broader potential ramifications for two reasons. First, this could impact private enforcement efforts more generally beyond just this case, and those can be an important adjunct to the government's own enforcement efforts. And second, while the error here was in the antitrust injury context, the error was its misconception about the anti-competitive effects of price fixing, and price fixing is almost always treated as a per se, is almost always condemned as per se unlawful. But there are rare exceptions, as in the sports league context, as in the recent NCAA Alston decision before the Supreme Court, where it's assessed under the rule of reason. And in these cases, under the rule of reason, a plaintiff, whether that's a government enforcer or a private plaintiff, would need to demonstrate anti-competitive effects of the price fixing conspiracy as part of proving a violation. We think it's important in these cases that the plaintiff be able to point to the full range of potential anti-competitive effects when proving its case. The full range is not just the payment of super competitive prices, but also reduction in output. Reduction of output, diminished product quality, diminished consumer choice. We said to the cases at pages 14 and 15 of our brief that discuss a variety of anti-competitive effects. Now, in recognizing that as an antitrust injury, does that also mean that when we're talking about the directness of the injury, when we're thinking about who's an efficient enforcer, there can't be a distinction between those kind of types of injury? Your Honor, the efficient enforcer is a separate consideration from the antitrust injury. And we do not take a position here on how the efficient enforcer factors would play out in the absence of the district court's holding. Our position here is that the district court's antitrust injury holding was erroneous because it is limited. I mean, the full range of effects from price fixing, is your position that all of these effects follow directly from a price fixing conspiracy? So, therefore, there's no reason to think of one as more or less direct, or you think it's possible that you still could? Your Honor, that would likely depend on the exact circumstances of the particular case, whether the reduced output injury or diminished consumer choice are direct effects, or if they are somehow indirect. But they could be direct effects under the particular effects of the case. There's nothing that's more direct in particular. Well, I mean, I guess the leading treatise on this sort of, I guess, acknowledges what you're saying. That as an economic matter, okay, sure, this is an economic injury. But as a practical matter, this is generally pretty tough to do with non-purchasers. That probably goes to who's an efficient enforcer. But do we need you guys just to tell us what the leading treatise is telling us? Yes, Your Honor. That's how we read the treatise as well, in that it directly undermines the district court's holding here. Because it states as an economic matter, as Your Honor stated, that there is antitrust injury for a priced-out non-purchaser in these circumstances in the form of reduced output. So you're asking us to issue an opinion that basically reverses the district court with respect to its injury holding. But you don't take any position with respect to its alternate holding about efficient enforcer. Your Honor, we read the district court's holding about non-purchaser status as having influenced both elements of its holdings, both the antitrust injury and the efficient enforcer holding. Obviously, it's more directly in the antitrust injury holding. But the court did reason fairly categorically that the direct TV status as a non-purchaser rendered it an inefficient enforcer and indirect harm. And that's kind of what I read on Hogan Camp also agree, don't they? That this makes it a pretty impractical enforcer. Yes, Your Honor. But what the district court didn't do was it didn't assess if the Ninth and Tenth Circuits held would be relevant, whether there was a prior course of dealing that rendered this particular plaintiff's harm significant. Right, so the priced-out non-purchaser has speculative harm when they are just purchasing for the first time, and it's unclear maybe what it would have meant to them if they could add some kind of new product or have access to some new input. But a purchaser who has a prior course of dealing and then there's a price-fixing conspiracy that raises the price of an input might be differently situated, and it might not be as speculative, right? Yes, Your Honor. That's our reading of the case law as well. Also, your position is that the purchaser-non-purchaser distinction on which this court relied was wrong for antitrust injury and it affected the efficient enforcer factors, and I guess your position would be to vacate that efficient enforcer decision and to remand to say, well, in light of understanding that that is not a dispositive distinction, you should redo the efficient enforcer analysis. Correct, Your Honor. I agree with that. And you don't really have a position on how it should come out. That's correct, yes. Thank you. As we said in our brief, we ask this court to correct the district court's error and to vacate and remand. Okay. Thank you, Mr. Galanis. Mr. Oberheim. Good morning, and may it please the court. I'm going to just start at the top with antitrust injury since that's where my colleague started, and he started by saying that there's no bright-line rule against non-purchaser standing in a price-fixing conspiracy. Did the district court hold that there is a bright-line rule that there can be antitrust standing only if there is a purchase at super competitive prices? I never read the opinion that way, Your Honor. I know the government has read it that way. I don't think there is a bright-line rule that's in there. I don't think this court needs to find a bright-line rule. To the extent the district court opinion could be read as setting forth a bright-line rule, you're not endorsing that? Well, I don't think we need to decide the case in our favor. What I'll say about the bright-line rule is that, as Judge Hullivan was saying, you know, in Irita and Hovenkamp, they're talking about non-purchasers almost never have standing. You've got two circuit court cases, one from 1981 and one from the 10th Circuit, and you've got City of Oakland and the 9th Circuit. But this is not a situation where someone just comes in and – well, someone doesn't come in and declines to buy. There's a course of dealing. The allegation is that the conspiracy targeted DirecTV. Doesn't that make it different from the usual non-purchaser situation? I guess a couple of things there, Your Honor. First of all, no circuit court has held that course of dealing is an exception to non-purchaser standing. It's dicta in Montreal trading. It's in a footnote in City of Oakland. Does it make sense? Is it a matter of common sense? Isn't it logical? I suppose it could, Your Honor, but I'm not even sure they pled the regular course of dealing that's required here. Well, the question about the pleadings, I mean what about just in the abstract? So if the argument is that it's too speculative if you're a priced-out non-purchaser as to what the effect of the price-fixing would be, if, in fact, you have a purchaser that has a prior course of dealing where they've had these kind of contracts on a number of occasions before, so you have a kind of baseline about what a competitive price might look like, and you can look and see a correlation between the lost subscribers and the reduced output, why is that speculative? It seems kind of straightforward that you can sort of figure out what the harm to the company would be in those circumstances. I suppose in theory, Your Honor, there could be a course of dealing exception. I'm just saying no circuit court has held that, and if it was held here, you'd be the first circuit court to hold that. On some level of detailed pleading, I suppose you could get past the point of speculation. I still think you'd have an attenuation problem in a case like this, a first-step problem because the lost profits are not the injury at the first step of this conspiracy. So why is that true that it's not the first step? So in the other cases where we talk about the first step, we talk about a series of transactions down the line, but here DirecTV is the party that's sitting across the table from the sidecar companies, right? So it is an effect of that very first transaction that's alleged to involve anti-competitive conduct. But the injury is not at the first step, Your Honor. The injury is two steps removed, and it relies on the decisions of third parties, the customers of DirecTV. And in Ray Platinum, there's a lot of discussion about third parties breaking the chain after the first step. But in those cases, yeah, I understand. I mean I wrote that. But there you had a benchmark manipulation, and then the benchmark was incorporated into other further transactions down the line, right? Or in American Express, you had contracts with American Express and then separate contracts with MasterCard and Visa. But here what we're talking about is the sidecar companies are sitting down for a negotiation with DirecTV itself, and then DirecTV is bearing the brunt directly of the anti-competitive conduct of the sidecar companies. So it's a little weird to say that it's not the first step. That is the result of the first transaction. I guess respectfully, Your Honor, I would say the injury is still resulting from the decisions of third parties, which is the key point here. The first step injury would be the paying of super competitive prices. What you're saying is if they're faced with anti-competitive conduct that leads to a reduction in output, it's a separate step that they're not going to make as much money once they reduce output because maybe consumers would be happy to pay higher prices for a lower level of output. And that seems weird to say that that's a separate step. Doesn't it just follow directly from the idea that they're forced to reduce output that it's going to be a harm? I don't think so because choices still have to be made by the third parties. That's sort of the baseline rule. It's the baseline rule, I think, of the first step analysis, Your Honor. There's a lot that would go into that decision. So wouldn't that argument have a lot – so even if they had paid – I don't know. Let's say that they had paid kind of super competitive prices, but then you could say, well, they could have passed on those prices to the consumers and not lost any money as a result of it. Maybe they'd even make more money because they could have raised their prices. So this kind of idea that the consumer choices are a separate step, I don't – doesn't that undermine the idea that anything is really at the first step? They're not going to lose any money until consumers make their choices in any event. Well, I think, Your Honor, I mean with respect to this particular product too, you have – what DirecTV is doing is compiling multiple different channels. And so in addition to just deciding whether or not these customers would have gone away, what you're basically saying is, well, would they have gone away because this one channel wasn't added? Is the package good enough? There's just a lot of speculation. It's kind of artificial to talk about. It's a sort of interesting context where it's sort of rebroadcast agreements. But let's say it's a manufacturer of housing and somebody is fixing the prices for lumber, and so they're faced with super competitive prices. Either they pay more for lumber or they reduce the number of houses they're building. It's pretty straightforward if they have to reduce the number of houses they're building that they're going to lose money because they're producing fewer products. It's not like a separate question as to whether, well, maybe consumers will pay the same amount of money for fewer products. It seems weird to think about that as a separate step where it might turn out not to harm them. When the prices are paid, yes, I agree with you. But when the super competitive price is not paid, then you're in this world where you don't know what the price would be paid by the consumer, the house builder in that sense. And now you're depending on – In the case of a builder who's faced with super competitive prices for lumber, if that builder decides not to pay the super competitive prices and so as a result is just building fewer houses and then loses money, you'd say that that is not an injury at the first step. Well, I guess I would say it's potentially more direct than we have here, Your Honor, because here – But why is it different? Well, because here there's – the record shows that there were a lot of blackouts going on and DirecTV was losing customers regardless. So, I mean you have a whole industry here where – But that's something you can figure out because you can look at the trend of losing customers over time and then see if that trend is affected by the blackout. Maybe on the merits it will turn out you can't attribute any of the loss of customers to the blackouts, but that's not a standing or even antitrust standing question. Respectfully, Your Honor, but you still would never know whether DirecTV would have even paid the competitive price. That's one of the two key speculative points about being a non-purchaser, right? But the point is it wouldn't pay the super competitive price. As a result, there was a blackout. As a result of the blackout, they lost some of the big four. Because they lost some of the big four, they lost subscribers. Why isn't that adequate injury? But we don't know whether they would have paid the competitive price, Your Honor. That's the speculative point about a non-purchaser standing issue. So we're at the pleading stage. They had a contract before. There was a course of dealing. They were paying the competitive prices before. Why isn't it a plausible inference that if the price had been competitive, they would have paid it? I suppose, Your Honor, if those were the allegations, but there was no pleading that they were paying the competitive price before. And also – But they were in a contract before. So isn't it a reasonable inference that they were paying before? Respectfully, Your Honor, not in this market because over the course of three years, this is where the regular course of dealing comes in. This contract was three years old. The prices, as DIRECTV has said, are going up sort of market-wide. So a lot has changed in the course of three years. It's not regular enough, and it hasn't been pled that way where you can actually make those inferences and assumptions, Your Honor, is what I would say about that. So wait. So just on that point, what would be the kind of pleadings where you could make that inference, and how do these pleadings fall short? Well, I think in the city of Oakland, for instance, about regular course of dealing, you'd have to have more recent dealing with details about sort of what the price was, how this differs from it to show – to give the necessary support that they're not speculating on whether or not they would have paid the competitive price. We have nothing about that in the record, Your Honor, where they would have paid the competitive price. Yeah, but we have the allegation that they had a prior contract with these parties and that they have a history of offering these channels. So why isn't the plausible inference that they have paid prices for these rebroadcast rights in the past? And then in this particular negotiation, it broke down because of the attempt to charge supercompetitive prices. It's because of the passage of time, Your Honor, and the way the market is moving. So you're just saying the course of dealing is not comparable to this particular deal because the circumstances have changed so dramatically? It's not regular, Your Honor, which is what city of Oakland referred to as the exception. I mean, it's possible that maybe you're right. I don't know. But that seems like a factual dispute, doesn't it, as to whether the prior course of dealing does establish a kind of a baseline where it really ends up not being comparable? And if we're on a motion to dismiss, shouldn't we make the inferences in favor of the complaint? Well, absolutely. Yes, that's the standard, Your Honor. But all they've pleaded is one line. It's actually half of a paragraph saying we had a deal before, essentially. That is not enough to show that you would be again to make an exception to this rule that has not been applied by any circuit court to say, OK, well, this is the one exception. Can I ask about an efficient enforcer? So given the allegations here, who is the more efficient enforcer, assuming there is, in fact, this horizontal price fix? Your Honor, I think you raised it. It would be other MVPDs that paid the super competitive price. There is an allegation, as I think Your Honor pointed out, about at least one other MVPD. I believe the allegation basically says there are other victims of this price fixing conspiracy. So I did want to make that point. This is not targeted as pled. There are more. So there are other MVPDs who would be the more efficient enforcer. Are there? I mean I don't know. So there are a lot of allegations that talk about targeting DirecTV. But then there is that allegation that says there are other victims out there. I don't know what those are. I guess there's DISH, which suffered also a blackout, but that suggests they didn't pay the price if they suffered a blackout. So it doesn't mean – so I don't know if I can infer from these allegations that there is another MVPD that paid the price. And if there's a dispute about that, again, that seems like a factual dispute, doesn't it? Well, it seems like it's using a – I don't know if this is the right way to put it, but almost a reverse inference in their favor. They've pled the existence of this broader conspiracy. That's not what the appellee said. So they've said there's other victims, so that would be the more efficient enforcer, Your Honor. If there's somebody who paid the price. Super competitive price, absolutely. So let's say there are other victims, but everybody refused to pay the super competitive price. So then there's nobody around who paid the super competitive price. Then there wouldn't be a more efficient enforcer, right? That wouldn't make economic sense, Your Honor, because then you have a price-fixing conspiracy where no one actually benefited from the higher prices. And that's a fundamental problem with these allegations. And a failed price-fixing conspiracy, it's almost like an oxymoron. You have to pay the higher price for the benefit. I mean that's going to be a merits question because the allegation is that they're colluding with Nextar. And so maybe Nextar benefits from the sidecar deals falling through because they can extract higher prices later. I don't know if nobody is benefiting. That's to be decided later. Well, respectfully, it's in the record, Your Honor, but Nextar has reached a deal. So we're not allowed to know the details of that necessarily, but they have reached a deal here. No amendment to the complaint was made about super competitive prices paid. So I think that's just – that is in the record. Okay, but so at that point, doesn't that go to the merits? Maybe you'll show there's no antitrust violation at all because they weren't coordinating. It didn't actually allow Nextar to extract super competitive prices in its own negotiation and whatever, but that's not an efficient enforcer point. Well, it's an antitrust injury point and an efficient enforcer point, Your Honor, both because, again, in the absence of the super competitive payment. That's what's missing from the allegations. That's what makes it a standing question under sort of the standard non-purchaser standing rules. And on the first step, I think we're disagreeing on that, Your Honor, but that's where it becomes important. And also an efficient enforcer, Your Honor, it also leads to the speculativeness of the damages because, again, we don't know what the competitive price or whether DirecTV would have paid the competitive price. All right. Well, thank you. We'll now hear from Justice Mazzino for two minutes of rebuttal. Thank you, Your Honor. Thank you, Your Honor. How do you respond to that argument? We don't know whether DirecTV would have paid a competitive price and that that would be speculating. So, Your Honor, a couple of points, a factual and a legal response. Factually, I think the complaint makes clear DirecTV has a long history of successfully negotiating retransmission consent agreements with these defendants. So I think there's at least a plausible inference that at a competitive price level, DirecTV would continue to reach a successful agreement as it had in the past. The legal point is this court held in Gelboim that an antitrust plaintiff does not need to rule out the possibility that it could have suffered the same injury under competitive conditions. The question is, did the conspiracy make the injury more probable than it would have been had the parties been acting unilaterally? And so I don't think that's our burden. But this is not going to be a concern for somebody who did purchase at the super competitive price, right? This is an inquiry that's not going to have to happen if that's the efficient enforcer. That's right. I think that's right, Your Honor, if you had such a party. Although, of course, some of the inquiries my friend talked about would still have to happen. You do allege in the complaint that DirecTV is not the only MVPD that's victimized by this. So, I mean, don't we have to take you at your word? We're going to ignore that now? Not asking you to ignore it, Your Honor. If you look at that paragraph, what it alleges is that Dish was similarly blacked out. So I think that first of all I think that- Again, that goes to an economic model where there are only non-purchasers. And that doesn't seem to be what the antitrust laws are about. It prevents the owners of a product from selling to anyone. They're allowed to not sell to anyone, aren't they? They are allowed unilaterally to not sell, although not in this case under federal law. They actually have to negotiate under federal law. But they are not allowed to collude to fix the prices at a super competitive level. And there's no requirement in antitrust law that the conspiracy be successful. The Supreme Court has said going back decades, Coney Vacuum, price fixing is per se unlawful even if the prices are set at an unreasonable level, even if the conspirators fail to- But that's your theory of the conspiracy. This is a conspiracy that is designed to prevent anyone from getting these rights. Well, I think it's designed to do two things, Your Honor. One is to hopefully, from the defendant's perspective, to eventually extract the super competitive rents even if that's not happening immediately. And the second purpose, it's alleged in the complaint, is to establish a pricing benchmark that Nexstar can point to in other settings and other negotiations. And that purpose of the conspiracy is absolutely served even if Direct-to-Be doesn't agree to pay the super competitive prices. What about the point that your allegations are insufficiently detailed to really establish that you have a course of dealing where you pay competitive prices? Right. So, Your Honor, I mean, first point, the district court didn't rule on that basis. And if this court were to announce a rule that requires us to plead more, we'd appreciate an opportunity to do that. We certainly could. But I think the pleading is perfectly sufficient. We pled in paragraph 97 that we have existing three-year retransmission consent agreements that we're seeking to renew with both defendants. We also pled in paragraph 126 that we had a history of entering into numerous similar three-year retransmission consent agreements with both defendants. I think this is very comparable. But you're saying if you had to allege how much you paid and why that's competitive and what the conditions were or whatever, you're saying you could do that? We could, Your Honor. I mean, that seems to me much more like the kind of thing that you'd get into after discovery at summary judgment. That's not, in my experience, not typically pled in the complaint. And certainly in a case like Pandora, which is very similar to this case, you can look at the complaint there and Pandora didn't plead that level of detail and the district court held that Pandora was an appropriate party to bring that action. Mr. Mazin, what I'm puzzled by is it seems to me that most courts and certainly the treatise writers seem to think that non-purchasers are generally not efficient enforcers. Your rule would seem to suggest that non-purchasers are always efficient enforcers, that they can always manage to do just what a purchaser would and that therefore there should never be a situation where a non-purchaser is not able to both assert antitrust standing and establish that they're an efficient enforcer. Am I wrong about that? Respectfully, I think you are, Your Honor. Why is that? We are very comfortable with the approach to this issue that's set forth in the Aretha and Hogan Camp Treatise and by the Ninth and Tenth Circuits. All of those sources distinguish between somebody who comes in with no established course of dealing and just says, I would have bought it at a competitive price and can't distinguish themselves from anyone else in the world. We agree that person is going to have serious difficulties establishing that they have a non- But what's the difference between somebody who's never purchased before but says, I would have bought it at a lower price and I can establish that that lower price would have been the competitive price but for the price fixing? The concern those courts expressed is that you could have an unlimited number of plaintiffs who could come in and make that exact same claim. You know, defendants fix the price of televisions. If televisions had been priced competitively, I would have bought one. And when anyone in the world can make that claim, the court says that that must be too broad. We need to limit that to people who actually bought televisions. But all of those courts have been very careful to distinguish the situation where the plaintiff has an established course of dealing that sets them apart. It seems that your argument is turning on a small, relatively small market. We're not talking about the purchasers of televisions. We're talking about the purchasers, basically the MVPDs. Your purchases are that. I think those are both relevant factors, Your Honor. I mean, we certainly have a long established course of purchasing from these defendants, and I think that's sufficient under the Ninth and Tenth Circuit case law. I also think even if we didn't have that- If a new startup came in and said, look, we want to break into this business as well. We're going to be a competitor of DirecTV, and they have no course of dealing with the defendants, they couldn't bring a claim for antitrust violations. Your Honor, it would be a different case, and I don't need- Of course it would be a different case. But why would it make a difference that they never had a course of dealing before, and therefore they can't establish all the things that you would establish about what they would pay and what they were being asked to pay as a result of horizontal price fixing? So if I were representing a plaintiff in that situation, I don't think I have to convince you of that to win this case. But if I were representing that plaintiff, what I would say is the unique conditions of this market where you have a small number of potential buyers, and under federal law, the defendants are required to negotiate in good faith with every MVPD, cannot refuse to negotiate with them, and cannot demand super-competitive terms, I would say that allays the kinds of concerns that the Ninth and Tenth Circuits had about anyone in the world coming in and claiming to be a purchaser. But to put it in terms of the efficient enforcer factors, I take it your position would be the non-purchaser has a direct injury, even if they're just a non-purchaser who's priced out of the market, it's direct, because that's a result of super-competitive pricing. And then the question would turn on whether they're more direct victims, which there may or may not be. And mostly, and this is what a read in Hoeven can focus on, the speculative nature of the harm, right? So the idea is the non-purchaser who's priced out of the market, often it's speculative as to what the harm would be if they could have purchased and it would have made a difference. But you're saying the difference that these circumstances make that you have a course of dealing in a small market with a fixed set of consumers is that it means that it wouldn't be speculative to calculate the harms. That's right. Let me just offer one amendment to that. I think I agree with almost everything you said. I think where the speculation or the concern about speculativeness comes in is not so much in calculating the amount of the harm. There's always some uncertainty there. But it's, as Rita and Hoeven can say, it's in identifying who the purchasers would have been. Rita, echoing the Tenth Circuit, says we just don't know. We can't identify who actually would have purchased at the competitive price and who wouldn't have. That's just not a concern on this record. Right, and so you're saying that's the Rita Hoeven can't concern. But you're saying on this record, you know that you would have been the purchaser because you have a history of it and you're legally required to have these negotiations. That's right. And that reduces the speculation. That's right. And we're not squeezing anyone else out because there's no limit on the number of retransmission consent rights that can be sold. So it's not a limited product where you have to say, you know, there can only have been three buyers and we don't know who they would have been. So if it were a limited product that only, like, I don't know, let's say the retransmission degrades if it's rebroadcast too many times or whatever it is, you're saying that would be a different case because it might have been that the rights went to the people who ultimately purchased it anyway. Yeah, I think that's one of the factors the Tenth Circuit talks about in Montreal trading where I think the product issue is potash, which is a limited resource, and the court says, you know, you could potentially have a situation where the number of plaintiffs who are claiming they would have purchased potash exceeds the total available supply of potash in the industry. And that also is not a concern here. But it seems that the prior course of conduct doesn't seem to be doing much for you here. You're really relying, it seems to me, on the small size of this market. So, respectfully, Your Honor, I think I'm relying on both. And I think the prior course of conduct is what sets Directivi apart from anyone else. Now, it's true, given the nature of this market, Your Honor and I, we couldn't come in and say we would have bought retransmission consent rights. That wouldn't be plausible. But if somebody else- Well, if we got ourselves a ton of private equity money and decided we were going to build a rival network, we sure could. You're saying that we'd be out of luck because we didn't have the fortuity of prior dealings. I'm saying I don't have to win that case because we do have prior dealings. You don't even have to make that case, it seems to me. What you're really arguing is in a small market, you are an efficient enforcer. Even if you haven't purchased before, you just have to show that you're likely to purchase in the future. Your Honor, I think particularly with the federal law requiring them to negotiate, I think that's true. But even if you're not persuaded of that, I think the moment- Well, no, but you've been arguing the whole time. It's this prior course of conduct that is just really what distinguishes this from so many of the other cases. But it doesn't really seem like now that you're arguing that. I am arguing both, Your Honor. My intent is to say these are two independent bases that both support us, and I'd be happy to win on either one. All right. Well, you'll have to wait. We will reserve decision, but thank you all. It was a very interesting conversation and well-briefed as well. Thank you, Your Honor. Thank you, Your Honor.